**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

RIAN TYLER STRUCKMAN,
  *Defendant-Appellant.*

No. 08-30463

D.C. No.
3:05-CR-00068-HA

OPINION

Appeal from the United States District Court
for the District of Oregon
Ancer L. Haggerty, Senior District Judge, Presiding

Argued and Submitted
December 10, 2009—Portland, Oregon

Filed May 4, 2010

Before: Jerome Farris, Dorothy W. Nelson and
Marsha S. Berzon, Circuit Judges.

Opinion by Judge Berzon

6633

## COUNSEL

Jacob Wieselman, Lake Oswego, Oregon, for the defendant-appellant.

Kent S. Robinson, Assistant United States Attorney, Portland, Oregon, for the plaintiff-appellee.

## OPINION

BERZON, Circuit Judge:

Around midday on December 7, 2004, three uniformed police officers entered the fenced-in backyard of a private home in a residential neighborhood of Portland. Guns drawn, but without a warrant, one scaled the fence and another kicked open a padlocked gate leading into the backyard. The only information the officers had at that time was (1) a call from a neighbor reporting that the owners were at work and that a white male wearing a black jacket, age unknown, had thrown a red backpack over the fence and climbed into the backyard; and (2) their visual confirmation that a red backpack was lying against a porch in the backyard and that the person they saw in the yard, who turned out to be the appellant, Rian Struckman, was a white male wearing a black jacket, which he allowed to fall to the ground after being confronted by the officers. The officers' first statements to

Struckman were to order him to get down on the ground.
Struckman's first statement to the officers was that he lived
at the house. As it turned out, he did, but the officers only
found that out after Struckman was arrested and after they had
searched the backpack, finding an unloaded handgun. By that
point, the officers had also learned that Struckman was a for-
mer felon, however, and arrested him as a felon in possession
of a firearm in violation of 18 U.S.C. § 922(g)(1). He was
ultimately found guilty in a jury trial of that crime and sen-
tenced to 17 years in prison.

Struckman appeals the district court's denial of his motions
to suppress and his sentence. We conclude that the police offi-
cers' warrantless actions violated Struckman's Fourth
Amendment rights. We therefore reverse the district court's
order denying Struckman's motion to suppress the handgun
found in the backpack and, because the gun was critical to
Struckman's conviction, vacate the resulting conviction.

## I.  Background

On December 7, 2004, at approximately 11:45 a.m., Wendy
Grimes called 911 and reported that she saw a white male
wearing a black leather or vinyl jacket throw a red backpack
over her neighbors' fence and then climb over the fence into
their backyard. Ms. Grimes also stated that her neighbors
were not at home and, although she indicated a suspicion the
man was trying to break into her neighbors' house, she also
said she could not see what he was doing through her neigh-
bors' fence.

The dispatcher sent three police officers to investigate the
report, directing them to the home and telling them only that
"[a] white male climbed the fence on the west side. White
guy, black leather jacket, red backpack. Residents not there at
this point."

Officers Mudrick and Wilson arrived at the house first.
Officer Mudrick approached a padlocked gate leading into the

UNITED STATES V. STRUCKMAN                      6639

backyard on the east side of the house. Officer Wilson
approached the west side of the house. The backyard
was entirely enclosed by a six foot tall fence. Officer Mudrick
climbed atop an object positioned next to the gate to get a better
view while Officer Wilson peeked into the yard through a
small hole in the fence.

Officer Wilson saw Struckman, who fit the description of
the person given by the 911 dispatcher—"[w]hite guy, black
leather jacket"—walking inside the backyard. He also saw a
red backpack lying next to a deck in the yard. At this same
time, on the other side of the house, Officer Mudrick saw
Struckman walk around the back of the house in his direction.
He saw no signs of any forced entry into the house. As
Struckman turned the corner, he noticed Officer Mudrick staring
at him from over the top of the fence. With a look of surprise,
he stopped walking.

The following events took place over a span of roughly 25
seconds: Officer Mudrick testified that once Struckman saw
him, he immediately "took off his jacket . . . and let it fall to
the ground." Officer Wilson's testimony was slightly different:
Struckman "shook" his "leather jacket off his shoulders";
it "just sort of fell down his arms." Officer Wilson also testified
that Struckman's hands remained "down by . . . his thighs
. . . as [his] jacket dropped down." Both officers testified that
Struckman did not attempt to run and had nothing on him at
that point other than his shirt and pants. In particular, he had
no visible weapons or burglary tools.

Officer Mudrick drew his firearm and pointed it at Struckman
straightaway, ordering him to get down on his knees.
Struckman complied without hesitation. Officer Mudrick then
reholstered his firearm and climbed over the fence into the
backyard. During this time, Officer Wilson, who had also
drawn his firearm, moved to the east side of the house. Officer
Mudrick, who was now inside the yard, drew his firearm
again, approached Struckman, and began to handcuff him. At

this time, Officer Singh arrived at the house and immediately kicked open the padlocked gate leading into the backyard. Both he and Officer Wilson then entered the backyard to help Officer Mudrick finish handcuffing Struckman and search the area.[1]

According to Officers Mudrick's and Wilson's testimony,[2] after Officer Mudrick climbed into the backyard, Struckman began cursing sporadically and repeatedly stated that he lived at the house.[3] Struckman also requested that Officer Mudrick use his cell phone to call his mother to confirm that he lived at the house. Officer Mudrick ignored Struckman's request, however, and proceeded to conduct a pat down search. During this time, Struckman's behavior alternated between cooperative and aggressive; on one or two occasions Struckman tried to pull away from Officer Mudrick's grip.[4] As a result, Officer Mudrick forced Struckman to the ground to complete the pat down search, at which time he felt a long, hard object in Struckman's front right pants pocket. He opened the pocket and discovered an unloaded handgun magazine. Officer Mudrick then completed the search and asked Struckman whether there was a gun inside the red backpack, which was lying approximately 20 to 25 feet away at this time. Officer Mudrick testified, and the district court found, that Struckman replied, "I don't know, it's not mine." Struckman, on the other hand, testified at trial that he also stated, "It's my sister's bag."

---

[1]At some point, one of the officers informed the dispatch: "Got a gun on that guy. Burglar."

[2]Neither Struckman nor Officer Singh testified at the suppression hearing.

[3]The district court found that Struckman stated that he lived at the house before Officer Mudrick climbed over the fence. That finding is not supported by the record, however, as both Officers Mudrick and Wilson testified that Struckman did not state that he lived at the house until *after* Officer Mudrick was inside the backyard.

[4]Struckman testified at trial that he was high on methamphetamine at this time.

UNITED STATES v. STRUCKMAN                 6641

After Officer Mudrick discovered the unloaded magazine, Officer Wilson went to the red backpack and lifted a flap that was on the top of it. He saw the butt of a handgun and retrieved the gun from the backpack. There was no magazine in the gun.

Officer Mudrick eventually asked Struckman his name. Struckman gave his true name and stated that he was currently on probation. Officer Mudrick then ran a criminal history check, revealing that Struckman was on probation and did in fact live at the house.

After he was indicted on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1), Struckman moved to suppress the handgun found in the backpack, arguing that the officers' warrantless arrest and entry, and their subsequent search of the backpack, violated his Fourth Amendment rights.[5] The district court held an evidentiary hearing on the suppression motion and denied it.

The government filed a Notice of Sentence Enhancement under the Armed Career Criminal Act, 18 U.S.C. § 924(e)(1).[6] Following a jury trial, Struckman was found guilty of being a felon in possession of a firearm, and sentenced to 17 years in prison.

---

[5]Struckman subsequently moved to suppress the statement he made in the backyard concerning the backpack, arguing that the police officers failed to issue *Miranda* warnings. Because we conclude that the officers' warrantless arrest and entry violated Struckman's Fourth Amendment rights, we do not reach the *Miranda* issue.

[6]18 U.S.C. § 924(e)(1) provides, in pertinent part, that "[i]n the case of a person who violates section 922(g) of this title and has three previous convictions by any court referred to in section 922(g)(1) of this title for a violent felony or a serious drug offense, or both, committed on occasions different from one another, such person shall be fined under this title and imprisoned not less than fifteen years . . . ."

6642          UNITED STATES v. STRUCKMAN

## II.   Discussion

**[1]** The Fourth Amendment protects "[t]he right of the
people to be secure in their persons, houses, papers, and
effects, against unreasonable searches and seizures . . . ." U.S.
Const. amend. IV. "At [its] very core stands the right of a
[person] to retreat into his own home and there be free from
unreasonable governmental intrusion." *Silverman v. United
States*, 365 U.S. 505, 511 (1961). For that reason, "searches
and seizures inside a home without a warrant are presump-
tively unreasonable." *Payton v. New York*, 445 U.S. 573, 586
(1980). The presumptive protection accorded people at home
extends to outdoor areas traditionally known as "curtilage" —
areas that, like the inside of a house, "harbor[ ] the intimate
activity associated with the sanctity of a [person's] home and
the privacies of life." *United States v. Dunn*, 480 U.S. 294,
300 (1987) (quotations omitted).

This presumptive Fourth Amendment protection "is not
irrebuttable." *Hopkins v. Bonvicino*, 573 F.3d 752, 763 (9th
Cir. 2009), *cert. denied*, *Bonvicino v. Hopkins*, No. 09-681,
2010 WL 1265866, at *1 (U.S. April 5, 2010). In particular,
"[t]here are two general exceptions to the warrant requirement
for home searches: exigency and emergency." *United States
v. Martinez*, 406 F.3d 1160, 1164 (9th Cir. 2005). We have
described these exceptions as follows:

> The "emergency" exception stems from the police
> officers' "community caretaking function" and
> allows them "to respond to emergency situations"
> that threaten life or limb; this exception does "*not*
> [derive from] police officers' function as criminal
> investigators." *United States v. Cervantes*, 219 F.3d
> 882, 889 (9th Cir. 2000) (emphasis added). By con-
> trast, the "exigency" exception does derive from the
> police officers' investigatory function; it allows them
> to enter a home without a warrant if they have both
> probable cause to believe that a crime has been or is

being committed and a reasonable belief that their entry is "necessary to prevent . . . the destruction of relevant evidence, the escape of the suspect, or some other consequence improperly frustrating legitimate law enforcement efforts." *United States v. McConney*, 728 F.2d 1195, 1199 (9th Cir. 1984) (en banc).

*Hopkins*, 573 F.3d at 763. To succeed in invoking these exceptions, "the government must . . . show that a warrant could not have been obtained in time." *United States v. Good*, 780 F.2d 773, 775 (9th Cir. 1986). Here, the government does not invoke the emergency exception, but does argue that exigent circumstances justified the officers' warrantless arrest and entry into Struckman's backyard.

Before evaluating whether there were exigent circumstances, we note that the district court upheld the officers' warrantless search and seizure under *Terry v. Ohio*, 392 U.S. 1 (1968). That was error, as the *Terry* exception to the warrant requirement does not apply to in-home searches and seizures. *E.g.*, *Martinez*, 406 F.3d at 1165 ("[T]he usual rules pertaining to *Terry* stops do not apply in homes."). Commendably, the government does not defend the district court's suppression ruling on *Terry* grounds.

As a result of its *Terry* approach, the district court did not decide whether Struckman's backyard is curtilage subject to Fourth Amendment protection. That, however, is an issue we may decide de novo on the record before us. *United States v. Davis*, 530 F.3d 1069, 1077 (9th Cir. 2008). The district court did decide, in the alternative, that the police officers had probable cause to arrest Struckman for "committing some crime against the residence" and that exigent circumstances justified the officers' entry into the backyard "because they were responding to a 911 call of a potential burglary in progress." We review both determinations de novo. *Id.*; *see United States v. Russell*, 436 F.3d 1086, 1089 n.2 (9th Cir. 2004). We

address the issues of curtilage, probable cause, and exigent circumstances, in turn.

## A.

**[2]** The Fourth Amendment's protections extend to those areas in which a person has a "reasonable" expectation of privacy, *Smith v. Maryland*, 442 U.S. 735, 740-41 (1979) (quotation omitted); "an individual reasonably may expect that an area immediately adjacent to a home will remain private." *Oliver v. United States*, 466 U.S. 170, 180 (1984). "[C]ourts have [therefore] extended Fourth Amendment protection to the curtilage" to a home, *id.*, defining the extent of the curtilage with reference to four factors: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." *Dunn*, 480 U.S. at 301.

**[3]** "[F]or most homes, the boundaries of the curtilage will be clearly marked; and the conception defining the curtilage —as the area around the home to which the activity of home life extends—is a familiar one easily understood from our daily experience." *Oliver*, 466 U.S. at 182 n.12. Struckman's backyard—a small, enclosed yard adjacent to a home in a residential neighborhood—is unquestionably such a "clearly marked" area "to which the activity of home life extends," and so is "curtilage" subject to Fourth Amendment protection. *See United States v. Romero-Bustamente*, 337 F.3d 1104, 1108 (9th Cir. 2003).

## B.

The government asserts that probable cause alone justifies Struckman's warrantless arrest and the police officers' subsequent entry into his backyard. That is plainly incorrect. "It is clearly established Federal law that the warrantless search of

UNITED STATES V. STRUCKMAN                    6645

a dwelling must be supported by probable cause and the existence of exigent circumstances." *Bailey v. Newland*, 263 F.3d 1022, 1032 (9th Cir. 2001) (emphasis added).

The government also asserts, alternatively, that exigent circumstances excused the officers' warrantless arrest and entry. "[W]hen the government relies on the exigent circumstances exception [to the Fourth Amendment warrant requirement], it . . . must satisfy two requirements: first, the government must prove that the officer had probable cause to search the house; and second, the government must prove that exigent circumstances justified the warrantless intrusion." *United States v. Johnson*, 256 F.3d 895, 905 (9th Cir. 2001) (en banc) (per curiam) (citation omitted); *see also Welsh v. Wisconsin*, 466 U.S. 740, 740 (1984).

**1.**

**[4]** "There is probable cause for a warrantless arrest and a search incident to that arrest if, under the totality of the facts and circumstances known to the arresting officer, a prudent person would have concluded that there was a fair probability that the suspect had committed a crime." *United States v. Gonzales*, 749 F.2d 1329, 1337 (9th Cir. 1984). "[P]robable cause 'demands' factual 'specificity' and 'must be judged according to an objective standard,' " *Johnson*, 256 F.3d at 905 (quoting *Terry*, 392 U.S. at 21-22 n.18), taking into account "the nature and trustworthiness of the evidence of criminal conduct available to the police," *Beier v. City of Lewiston*, 354 F.3d 1058, 1064 (9th Cir. 2004). In assessing probable cause, we take into account reasonable inferences. *See, e.g.*, *Davis*, 530 F.3d at 1084.

Relying on the 911 report, the officers' initial sighting of Struckman, and Struckman's reaction to seeing Officer Mudrick, the government asserts that the officers had probable cause to arrest Struckman for either burglary in the first degree, attempted burglary in the first degree, or criminal tres-

pass in the second degree. The government also relies on Officer Mudrick's testimony that he believed, based on the 911 report, that he was investigating a burglary or attempted burglary.

Officer Mudrick's subjective beliefs are immaterial to our inquiry: "Probable cause is an objective standard[,] and the officer's subjective intention in exercising his discretion to arrest is immaterial in judging whether his actions were reasonable for Fourth Amendment purposes." *John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008) (citation omitted); *see Brigham City, Utah v. Stuart*, 547 U.S. 398, 404-05 (2006).

**[5]** We have little difficulty concluding that the officers did not have probable cause to arrest Struckman for first-degree burglary or attempted burglary. Under Oregon law,

> [a] person commits the crime of burglary in the first degree if the person violates O[r.] R[ev.] S[tat.] [§] 164.215 and the building is a dwelling, or if in effecting entry or while in a building or in immediate flight therefrom the person: (a) Is armed with a burglary tool or theft device . . . or a deadly weapon; (b) Causes or attempts to cause physical injury to any person; or (c) Uses or threatens to use a dangerous weapon.

Or. Rev. Stat. § 164.225(1). A person violates Or. Rev. Stat. § 164.215, Oregon's second-degree burglary statute, "if the person enters or remains unlawfully in a building with intent to commit a crime therein." In addition, a person is guilty of an attempt to commit a crime in Oregon if the person "intentionally engages in conduct which constitutes a substantial step toward commission of the crime." Or. Rev. Stat. § 161.405(1).

UNITED STATES v. STRUCKMAN                                    6647

**[6]** Here, it is undisputed that upon arriving at the house, the officers knew only that a neighbor had reported seeing a white male wearing a black jacket throw a red backpack over a fence and climb over the fence into the backyard when the owners were reportedly not home. Officer Mudrick testified that there were no indications that Struckman had entered or attempted to enter the home, as there were no signs of forced entry or the presence of any tools consistent with a possible burglary. Additionally, Struckman's presence in the backyard and his reaction to abruptly seeing Officer Mudrick, unannounced and peering over his six-foot tall fence—stopping, looking surprised, and shrugging off or allowing his jacket to fall to the ground—have no bearing on whether Struckman was attempting a burglary at the home.[7]

**[7]** The conclusion that the officers certainly did not have probable cause to believe that Struckman was engaged in first-degree burglary or attempted burglary does not end our inquiry, however. "Because the probable cause standard is objective, probable cause supports an arrest so long as the arresting officers had probable cause to arrest the suspect for any criminal offense, regardless of their stated reason for the arrest." *Edgerly v. City and County of San Francisco*, Nos. 05-15080, 05-15382, 2010 WL 986764, at *4 (9th Cir. March 19, 2010). We therefore consider whether the totality of the

_____

[7]It is unclear why Struckman shrugged off his jacket. He may have done so because his jacket pockets contained methamphetamine, a "digital gram scale," and a second unloaded gun magazine. Or, as Officer Mudrick testified, Struckman may have shrugged off his jacket in order to fight or flee, free of an encumbrance. Or, as Struckman testified at trial, he may have simply "slipped his arm out of [his jacket]" because "with the way that [his] jacket was [hanging off one arm at the time], when [he] went to go put up [his] arms, [he] thought it might create an obstruction." In any event, Struckman's intention does not matter. Our inquiry is limited to determining whether the objective facts and circumstances before the officer are sufficient to warrant a person of reasonable caution to believe that there was a fair probability that the suspect had committed a crime. *Gonzales*, 749 F.2d at 1337.

facts and circumstances support probable cause that Struck-man was engaged in another crime. The only alternative offense the government suggests is second-degree criminal trespass.

A person commits criminal trespass in the second degree in Oregon if he "enters or remains unlawfully . . . in or upon premises," Or. Rev. Stat. § 164.245(1), where premises are defined as "includ[ing] any building and any real property, whether privately or publically owned," Or. Rev. Stat. § 164.205(6). A person enters or remains unlawfully if he or she "enter[s] or remain[s] in or upon premises when the prem-ises, at the time of such entry or remaining, are not open to the public or when the entrant is not otherwise licensed or privileged to do so[.]" Or. Rev. Stat. § 164.205(3)(a).

Here, the officers came to the house because of information obtained from the 911 call—namely, that a white male wear-ing a black jacket had thrown a red backpack over a fence and climbed into the backyard when the homeowners were report-edly not home. They then visually confirmed that a person who fit the description was in the backyard and that there was a red backpack lying against a deck inside the yard.[8] To that point, the officers were engaging in good police practice. Assuredly, "police officers ha[ve] a duty to conduct an inves-tigation into the basis of [a] witness' report." *Fuller v. M.G.*

---

[8]Once again, the government brings up Struckman's surprised expres-sion upon seeing Officer Mudrick peering at him from over the top of his six-foot tall fence, arguing that it supports probable cause that Struckman was trespassing in the backyard. That fact, regardless whether one views it as innocuous or suspicious with regard to possible exigency, has little to do with whether Struckman "enter[ed] or [was] remain[ing] unlawfully" on someone else's property in violation of Or. Rev. Stat. § 164.245. Indeed, one would think almost any resident of a house would be quite surprised to see a policeman peering at him over his fence while he was in his backyard. Likewise, as to Struckman's shrugging off or discarding his jacket, whether or not it is pertinent to the exigency issue, *see infra*, it in no way supports the conclusion that Struckman had no legal right to be where he was.

UNITED STATES v. STRUCKMAN                    6649

*Jewelry*, 950 F.2d 1437, 1444 (9th Cir. 1991). There was no surface reason to discredit that Ms. Grimes saw what she said she saw, or knew what she said she knew.[9] So the fact that the police officers went to the house in response to Ms. Grimes's 911 report to look around the area and, perhaps, ask questions was consistent with what citizens expect from law enforcement—efforts to assure that they and their property are safe from unlawful, injurious acts by others.

At the same time, Ms. Grimes's report was very general; she did not say that she knew who all the occupants of the house were; and innocent reasons could have explained what she did see, including the actual explanation—a family member who lived at the house did not have his key. Indeed, many of us can recount tales about getting locked out of his or her own house, or the house of a relative where one is staying, and having to devise some creative way to get into the house.

**[8]** To avoid such errors as occurred here, in seeking to establish probable cause, "officers may not solely rely on the claim of a citizen witness . . ., but must independently investigate the basis of the witness' knowledge or interview other witnesses." *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 925 (9th Cir. 2001); *see Hopkins*, 573 F.3d at 767 ("[S]tatements from a witness, without further investigation by the police, are insufficient to support probable cause."). In circumstances similar to those here, for example, we have held that officers did not have probable cause to enter a home without a warrant based on "information provided by [a] neighbor [that] suggested that unauthorized people may be in [a] house," where there was no sign of a break-in. *Frunz v. City of Tacoma*, 468 F.3d 1141, 1144 (9th Cir. 2006). We have also determined that "officers did not have probable cause to enter [a] house based merely on a neighbor's report

---

[9]We note that in Oregon a person may be criminally liable for knowingly initiating and transmitting a false report to the police. *See* Or. Rev. Stat. § 162.375.

6650    UNITED STATES V. STRUCKMAN

of suspicious activity and an open door," *id.* at 1146 n.9 (citing *Murdock v. Stout*, 54 F.3d 1437, 1441 (9th Cir. 1995)), or where a witness was outside the suspect's house and told the officers only "that she had been involved in a[ ] [ ] minor car accident with [the suspect], that she smelled alcohol on his breath, and that he appeared intoxicated," *Hopkins*, 573 F.3d at 767.

As in *Frunz* and *Hopkins*, "[t]here was, in fact, much else the officers could have done" to investigate the reported activity. *Frunz*, 468 F.3d at 1146. Officer Mudrick testified that he had received "[n]o details as to who resided at th[e] residence." But Ms. Grimes had contact with one of the officers after he arrived at the scene, so the officers could have "ask-[ed] [her] . . . questions in order to gain information beyond her cursory and conclusory statements." *Hopkins*, 573 F.3d at 767. Such quick inquiries of Ms. Grimes might have determined who in fact lived at the house and why she thought the person seen climbing over the fence was not authorized to be there.[10]

More importantly, the officers could have asked Struckman a few simple questions, such as "What's your name?" "Do you live here?" "What are you doing in the backyard?" Instead, immediately after first making eye contact with Struckman, Officer Mudrick drew his firearm and ordered Struckman to get on the ground, and the officers surged into the backyard, with one officer climbing over the fence and another kicking open the padlocked gate. The officers then ignored Struckman's repeated protestations that he lived at the house and his request that the officers call his mother to confirm his statement, even though they could have learned that

---

[10]The 911 transcript indicates that Ms. Grimes initially reported the wrong address and pointed out the correct one to at least one of the officers after he had arrived in the area.

he did in fact live there by checking his identification against records easily available to them.[11]

**[9]** The officers did have reasonable suspicion—a "reasonable, articulable suspicion that criminal activity is afoot," *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)—that Struckman was trespassing. But reasonable suspicion is not probable cause, and it alone cannot excuse a warrantless arrest inside a private home or its curtilage. Absent some confirmation that Struckman was not authorized to be in the backyard, it is doubtful that the totality of the facts and circumstances here establish that there was a fair probability that Struckman was trespassing in the backyard.

**[10]** Nonetheless, no amount of probable cause can justify a warrantless arrest or entry absent an exception to the warrant requirement. *See Horton v. California*, 496 U.S. 128, 137 n.7 (1990); *LaLonde v. City of Riverside*, 204 F.3d 947, 954 (9th Cir. 2000). We will assume—although the assumption is weak—that the officers had probable cause to believe that Struckman was engaged in criminal trespass when they arrived.

**2.**

**[11]** As previously mentioned, the government relies on the exigency exception, as opposed to the emergency exception, to justify the officers' warrantless actions here. The exigent circumstances exception is premised on "few in number and carefully delineated" circumstances, *United States v. United States District Court*, 407 U.S. 297, 318 (1972), in which " 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is

---

[11]Officer Mudrick testified at the suppression hearing that the officers on the scene had computers in their patrol cars and radios attached to their uniforms that they could have used to call dispatch to determine whether Struckman lived at the house.

6652          UNITED STATES v. STRUCKMAN

objectively reasonable under the Fourth Amendment." *Brigham City*, 547 U.S. at 403 (quoting *Mincey v. Arizona*, 437 U.S. 385, 393-94 (1978)). We have previously defined those situations as (1) the need to prevent physical harm to the officers or other persons, (2) the need to prevent the imminent destruction of relevant evidence, (3) the hot pursuit of a fleeing suspect; and (4) the need to prevent the escape of a suspect. *See, e.g.*, *Fisher v. City of San Jose*, 558 F.3d 1069, 1075 (9th Cir. 2009) (en banc) (safety); *United States v. Ojeda*, 276 F.3d 486, 488 (9th Cir. 2002) (safety, escape, and evidence); *Johnson*, 256 F.3d at 907 (hot pursuit). Because the Fourth Amendment ultimately turns on the reasonableness of the officer's actions in light of the totality of the circumstances, *Brigham City*, 547 U.S. at 403, however, there is no immutable list of exigent circumstances; they may include " 'some other consequence improperly frustrating legitimate law enforcement efforts.' " *Fisher*, 558 F.3d at 1075 (quoting *United States v. Lindsey*, 877 F.2d 777, 780 (9th Cir. 1989)). "The government bears the burden of showing specific and articulable facts to justify the finding of exigent circumstances." *Ojeda*, 276 F.3d at 488.

The government suggests that this case involved the exigent circumstances of hot pursuit, escape, and the prevention of harm to the officers or other persons.[12] None of these circumstances actually existed when Struckman was arrested in the backyard.

---

[12]The government does not defend the district court's determination that the 911 call alone created exigent circumstances because the police officers were responding to a potential burglary in progress. As previously discussed, the officers were *not* responding to a report of a potential burglary in progress, only a report that a white male wearing a black jacket and carrying a red backpack had climbed over a fence into the backyard of a home while the homeowners were not there. Although Ms. Grimes told the 911 dispatcher that she suspected that the person was going to commit a burglary, she could not see into the yard to confirm that suspicion, and the dispatcher did not relay that speculative presumption to the officers.

UNITED STATES V. STRUCKMAN                    6653

**[12]** First, " 'hot pursuit' means some sort of a chase." *Santana*, 427 U.S. at 42-43. There was no chase here—no "pursuit" of Struckman, hot or cold. Struckman was already inside the backyard when the police officers arrived at the house. Although the officers entered the yard to handcuff Struckman and take him into custody, they were not chasing him; Struckman immediately stopped walking through the backyard when he saw the officers, and he then complied with their orders. Those same facts make clear that Struckman made no attempt to escape the yard. Indeed, Officer Mudrick expressly testified that Struckman made no attempt to flee.

**[13]** Likewise, contrary to the government's suggestion that the general public was in danger, the record contains no evidence that anyone other than the officers and Struckman was near the fully enclosed backyard, let alone put in danger by the occurrences therein. Nor was the police officers' entry into the backyard necessary to prevent harm to themselves. The government points to Struckman's reaction upon seeing the officers as suggesting some element of danger—he looked surprised and took off his jacket. Again, anyone, residents included, would be surprised at seeing a uniformed police officer peering at them inside their private, enclosed backyard from over the top of a six-foot fence. Surprise does not suggest a threat.

Even if Struckman *intentionally* took off his jacket after seeing Officer Mudrick—a point on which the record is murky—that conduct, peculiar as it may have seemed to the officers at that time, does not support an objectively reasonable basis for believing that the police officers' reaction—immediately drawing their firearms and entering the enclosed backyard—was necessary to prevent imminent physical harm to themselves while they remained outside the yard. In fact, Officer Mudrick testified that after Struckman's jacket fell to the ground, he was able to see Struckman's body clearly and saw no visible weapons on him. Additionally, Officer Wilson

testified that Struckman's arms remained down at his sides after he shed his jacket.

In support of its contention that the exigency exception is applicable here, the government relies heavily on Officer Mudrick's testimony that once Struckman shed his jacket, he *believed* that Struckman *intended* to flee or fight the officers free of an encumbrance. As previously discussed, however, an officer's subjective motivation for his actions is irrelevant in determining whether his actions are reasonable under the Fourth Amendment. *See, e.g., Brigham City*, 547 U.S. at 404 (string citation omitted). Likewise, conjecture about "what may or might have happened" is insufficient to satisfy the government's "heavy burden" of proving exigent circumstances. *United States v. Howard*, 828 F.2d 552, 555 (9th Cir. 1987) (quoting *United States v. Licata*, 761 F.2d 537, 543 (9th Cir. 1985)). "It therefore does not matter here—even if their subjective motives could be so neatly unraveled—whether the officers entered the [backyard] to arrest [Struckman] and gather evidence against [him] or to . . . prevent . . . violence." *Brigham City*, 547 U.S. at 405.

**[14]** Moreover, Officer Mudrick's belief that Struckman's shedding of his jacket meant that he was preparing to fight the officers assumes an intent to enter Struckman's yard, but does not explain or justify it. And there is an additional consideration here that strongly supports the conclusion that there was no exigency: Although "[a] warrantless arrest of an individual in a *public* place for . . . a misdemeanor committed in the officer's presence[ ] is consistent with the Fourth Amendment if the arrest is supported by probable cause," *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (emphasis added), "it is difficult to conceive of a warrantless *home* arrest that would not be unreasonable under the Fourth Amendment when the underlying offense is extremely minor." *Welsh*, 466 U.S. at 753 (emphasis added). For that reason, "this circuit has clearly held that 'an exigency related to a misdemeanor will seldom, if ever, justify a warrantless entry into the home.' "

*Hopkins*, 573 F.3d at 769 (quoting *LaLonde*, 204 F.3d at 956); *see Johnson*, 256 F.3d at 909 n.6 ("[I]n situations where the underlying offense is only a misdemeanor, law enforcement must yield to the Fourth Amendment in all but the 'rarest' cases.") (quoting *Welsh*, 466 U.S. at 753). For example, we have held that an investigation into the whereabouts of a person who had been resisting arrest, a misdemeanor, did not justify a warrantless entry onto private property. *Johnson*, 256 F.3d at 908-09. We have also held that the need to obtain a blood sample from a person suspected of driving under the influence, a misdemeanor, before the alcohol in his blood dissipated, was insufficient to justify a warrantless home entry. *Hopkins*, 573 F.3d at 768-89.

**[15]** Here, even if the police officers had probable cause to believe that Struckman was committing criminal trespass in the second degree in violation of Or. Rev. Stat. § 164.245, the offense is a Class C misdemeanor, *see id.*, carrying with it a maximum of 30 days imprisonment, Or. Rev. Stat. § 161.615. And, while we recognize that "the exigency analysis must turn on 'the *gravity* of the underlying offense,' . . . not its status as 'jailable' or 'nonjailable,' " *Hopkins*, 573 F.3d at 768 (emphasis in original) (quoting *Welsh*, 466 U.S. at 753), "the penalty that may attach to any particular offense seems to provide the clearest and most consistent indication of the State's interest in arresting individuals suspected of committing that offense." *Welsh*, 466 U.S. at 754 n.14. The 30-day maximum penalty attached to second-degree criminal trespass weighs against any finding of exigency. *Cf. Hopkins*, 573 F.3d at 768-69 (holding that the exigency exception did not justify a warrantless home intrusion where the offense was a violation of Cal. Veh. Code § 23152, a misdemeanor that carried with it a six month maximum penalty).

**[16]** In addition, while the commission of a misdemeanor offense is not to be taken lightly, it militates against a finding of exigent circumstances where the offense, like the criminal trespass at issue here, is not inherently dangerous. We have

held, for example, that police officers violate tenants' Fourth Amendment rights if they enter the tenants' apartment without a warrant based solely on the landlord's report that the tenants were trespassing. *See King v. Massarweh*, 782 F.2d 825, 828 (9th Cir. 1986). Further, "[o]ne suspected of committing a minor offense would not likely resort to desperate measures to avoid arrest and prosecution," *United States v. George*, 883 F.2d 1407, 1413 n.3 (9th Cir. 1989), so any inference of danger or escape from the commission of the offense alone is not reasonable.[13]

**[17]** In a case closely analogous to this one, the Sixth Circuit concluded that "[t]here is simply no legal support for holding that an ongoing criminal trespass, on its own, constitutes an exigency that overrides the warrant requirement." *United States v. Washington*, 573 F.3d 279, 287 (6th Cir. 2009). We agree. The risk from an ongoing crime can sometimes make a critical difference in determining the reasonableness of police conduct. *See Georgia v. Randolph*, 547 U.S. 103, 126 (2006) (Breyer, J., concurring) (discussing instances of domestic abuse); *see also United States v. Hensley*, 469 U.S. 221, 228 (1985). But in the absence of any "immediate and serious consequences," *McDonald v. United States*, 335 U.S. 451, 460 (1948) (Jackson, J., concurring), resulting from the commission of a crime, the "overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic," *Payton*, 445 U.S. at 601, militates against warrantless entry.

**[18]** Finally, there is the consideration here that even if the officers had probable cause to believe that Struckman was trespassing when they first saw him—which, as we said, we doubt but are willing to assume for present purposes—that

---

[13]By contrast, where there is probable cause to suspect a burglary, police officers "have no idea who might be inside [the home] and may reasonably assume that the suspects will, if confronted, flee or offer armed resistance." *Frunz*, 468 F.3d at 1145.

UNITED STATES V. STRUCKMAN                    6657

probable cause could easily have been dissipated by minimal inquiry at the outset, before the officers entered the backyard and searched and questioned Struckman. *Cf. Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 305 (6th Cir. 2005) ("Police officers may not make hasty, unsubstantiated arrests with impunity, nor simply turn a blind eye toward potentially exculpatory evidence known to them in an effort to pin a crime on someone.") (internal quotation marks omitted). Any such inquiry would have promptly revealed that Struckman actually lived at the house and was not trespassing, let alone attempting to commit a burglary. Moreover, "as far as the record reveals, [instead of immediately drawing their firearms, seizing Struckman, and entering the backyard,] the officers might easily have secured the premises and sought a warrant permitting them to enter." *Randolph*, 547 U.S. at 126 (Breyer, J., concurring).

For all these reasons, "[i]f we were to permit a warrantless . . . [arrest and] entry under these circumstances, which were not urgent or life threatening, the effect would certainly undercut making 'the presumption of unreasonableness . . . difficult to rebut,' " *Washington,* 573 F.3d at 289 (second alteration in original) (quoting *Welsh*, 466 U.S. at 750), and would strip tenants and homeowners of much of the protection "against unnecessary intrusions [o]nto [their] private [property]," *Welsh*, 466 U.S. at 748, provided by the Fourth Amendment warrant requirement.

## C.

**[19]** We emphasize that "Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." *Alderman v. United States*, 394 U.S. 165, 174 (1969). In other words, "[t]o claim the protections of the Fourth Amendment, defendants must demonstrate that they had an expectation of privacy in the property searched and that their expectation was reasonable." *United States v. Reyes-Bosque*, 596 F.3d 1017, 1026 (9th Cir. 2010).

6658          UNITED STATES V. STRUCKMAN

Thus, had Struckman been an actual trespasser, he would not be able to claim the protections of the Fourth Amendment with regard to his arrest in the backyard. *See United States v. Hernandez-Gonzalez*, 608 F.2d 1240, 1246 (9th Cir. 1979). As a result, the net effect of our holding is only that police officers must either obtain a warrant or consent to enter before arresting a person inside a home or its curtilage *or* make a reasonable attempt to ascertain that he is actually a trespasser before making the arrest. That easily could have been done here by asking Struckman to identify himself, a step one would ordinarily expect from the police where trespass is suspected.

### III.   Conclusion

[20]  The police officers' warrantless seizure of Struckman within his backyard and their entry into the yard to perfect his arrest, violated the Fourth Amendment.[14] We therefore reverse the district court's denial of the suppression motion. As the introduction of the evidence obtained as a result of the officers' warrantless actions was critical to Struckman's conviction, and the government does not contend that any error in failing to suppress it was harmless, we also vacate the judgment of the conviction.

**REVERSED and VACATED.**

---

[14]Because we conclude that the police officers' warrantless arrest and entry violated Struckman's Fourth Amendment rights, we need not reach the other issues raised on appeal.